UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
WILLIAM VAN PELT,

                       Plaintiff,

       -against-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                       Defendant.
--------------------------------------------------------X

**MEMORANDUM & ORDER**
Civil Action No. 15-0533(DRH)

**APPEARANCES:**

**SULLIVAN & KEHOE, LLP**
Attorneys for Plaintiff
44 Main Street
Kings Park, NY 11754
By: Alexandra Michalowicz, Esq.

**ROBERT L. CAPERS**
**UNITED STATES ATTORNEY, EASTERN DISTRICT OF NEW YORK**
Attorney for Defendant
271-A Cadman Plaza East
Brooklyn, New York 11201
By: Sean P. Greene, AUSA


**HURLEY, Senior District Judge:**

               Plaintiff William Van Pelt ("Plaintiff") commenced this action pursuant to 42

U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social

Security (the "Commissioner" or "Defendant") which denied his claim for disability insurance

benefits. Presently before the Court are Defendant's motion and Plaintiff's cross-motion for

judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons

discussed below, Defendant's motion is granted and Plaintiff's cross-motion is denied.

# BACKGROUND

## I. Procedural Background

Plaintiff applied for disability insurance benefits (DIB) on January 15, 2012, alleging disability as of January 11, 2012, due to a right knee meniscus tear, degenerative joint disease, depression, and obesity. (Transcript ("Tr.") 60-62.) Plaintiff's DIB claim was denied on March 20, 2012. (Tr. 60.) Subsequently, Plaintiff filed a request for a hearing, which hearing was held on June 27, 2013, before administrative law judge ("ALJ") Hilton R. Miller. (Tr. 60.) By Notice of Decision - Unfavorable, dated July 26, 2013, the ALJ denied Plaintiff's application for DIB, finding he was not disabled from January 11, 2012 through the date of decision. (Tr. 60-70.) Review by the Appeals Council was requested and on December 9, 2014, the Appeals Council denied the request. (TR 1-4.) This action followed.

## II. Factual Background

### A. Non-Medical Evidence

#### 1. Plaintiff's Testimony and Function Report

Plaintiff was born in 1966. (Tr. 78, 166.) He is a high school graduate. (*Id.* 80, *but see* 190 (stating he completed four or more years of college).) He worked as a police office and then a detective for the New York City Police Department from July 1988 through January 11, 2012. (*Id.* 80, 191.) He stopped working in early 2012, having been assigned to desk duty during the prior year. Because he needed to "stretch out' his leg a lot and walk around, it was "tough to sit," as was required for desk work. Additionally, he had difficulty climbing the stairs to his second floor desk. (Tr. 80-81.)

Plaintiff lives with his wife in a two story home; his bedroom is currently on the

first floor. (Tr. 78-79.) His wife does all the laundry and cooking although Plaintiff sometimes helps with the dishes by loading the dishwasher. He goes shopping with his wife, using a cart, but he is unable to last the whole trip and has to find a place to sit. His sleep is disrupted by the "constant toss[ing] and turn[ing] to find a comfortable position." He used to drive but stopped a month or two before the hearing when he started taking Opana; he takes the bus but has to sit "with a seat going out." He isolates and does not see family and friends. (*Id*. at 83, 85, 87-89.)

At the time of his hearing before the ALJ, Plaintiff had been receiving treatment for depression for four months and taking Wellbutrin for three month. (Tr. 79.) He initially injured his knee in the line of duty. During the course of a day he will elevate his leg - "[n]ot every day but probably at least four or five times a day" and keep it elevated from "15 to 20" minutes. He uses both hot and cold compresses. The weather will cause his leg to swell. He walks with a limp and if he goes "a good distance" his back and knee will start to hurt; he can walk five blocks without taking a break. Sometimes his knee locks and buckles. His hip has been bothering him for about a year; it causes a burning sensation when he sits but does not affect his walking. (*Id*. 84-89.)

Plaintiff completed a function report dated May 10, 2012, in which he represented the following information. He does "nothing" from the time he wakes up until he goes to bed; he usually just lies around and watching television is his only interest. He does not take care of anyone else or have any pets. He tosses and turn in pain all night. He is independent in personal care, except his wife helps him put on socks and pants, and he needs no special help to take care of his personal needs, grooming, or taking his medicine. He does not do any house or yard work; his wife prepares his meals. He goes outside three to four times per week and drives for short

periods of time. He has no friends and stays to himself.  He can stand and sit but not "for long" and described no difficulty with lifting. He walks with a limp and "it hurts a lot;" he uses a cane for "long distances" and can walk ten to twenty minutes before having to rest for one minute. He cannot kneel or squat but can climb stairs "one at a time" and has no difficulty reaching, using his hands, seeing, hearing, and speaking. (Tr. 197-205.) Although he cannot finish what he started due to frustration, Plaintiff stated he does not have trouble remembering things, can follow oral and written instructions, and has no trouble getting along with authority figures. (Tr.197-205.)

2.    <u>Testimony of Vocational Expert</u>

Gerald D. Belchick, a vocational expert called by the ALJ, testified that Plaintiff's past work as a detective was classified as light in exertion and skilled with an SVP of seven in the Dictionary of Occupational titles (DOT).

The ALJ posed the following hypothetical to Mr. Belchick: a claimant of Plaintiff's age, education, and work experience, with a residual functional capacity (RFC)  to lift and/or carry up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk with normal breaks for a total of about two hours in an eight hour workday; could not operate foot controls or a foot pedal using the lower extremities; had a sit/stand option with the ability to stand up every 20 minutes for approximately two minutes; occasionally climb ramps and stairs but never ladders, ropes or scaffolds; occasionally balance, stoop and kneel but not crawl or crouch; cannot operate a motor vehicle; had the ability to perform simple, routine, and repetitive tasks to moderately complex tasks that could be explained - specifically occupations with a SVP of one, two or three and which involve simple decisions and occasional changes in routine.

Belchick replied that there is only a small group of jobs with a sit/stand option that allows the employee to make changes between sitting and standing without interfering with the flow of work, which jobs come under the general heading of Cashier II, DOT code 211.462-010, and have a SVP of 2, i.e., a single-item cashier such as self-service gas station cashier, toll collector or ticket seller in a movie house. According to Belchick, there are about 11,000 Cashier II jobs in the greater New York area and over 980,000 nationally; a job such as surveillance systems monitor would not fit the hypothetical because that position does not allow for a sit and stand at will without interrupting the flow of work. (Tr. 92-95.)

A second hypothetical was posed by the ALJ to the vocational expert, which hypothetical was identical to the first except the requirement for a sit/stand option was deleted. Belchick testified that in such a case the following positions were available: unarmed security guard, DOT number 372.667-020, with 1,100 jobs locally and 80,000 jobs nationally; assembler of factory work, DOT 706.684-022, with 2,200 jobs locally and 360,000 jobs nationally; and information clerk, DOT 237.367-018, with 1,100 jobs locally and 72,000 jobs nationally. (Tr. 95-97.)

A third hypothetical was posed by plaintiff to the vocational expert. This third hypothetical was identical to the second except that the hypothetical claimant would have to take breaks where he elevates his leg four times in an eight-hour work day for 15 to 20 minutes at a time. According to Belchick such a condition would interrupt the work flow and therefore the jobs he described for hypothetical number two would not be available. (Tr. 97-98.)

**B.      Medical Evidence - Treating Sources**

1.      Riley Williams, MD

On January 1, 2011 Plaintiff saw Dr. Riley Williams, an orthopedic surgeon at the Hospital for Special Surgery. (Tr. 252.) He complained of catching and locking in his right knee as well as swelling and stiffness and pain while climbing stairs. (*Id*.) According to Dr. Williams' notes, Plaintiff recounted a history of knee pain, which began in 2005 when he felt his knee pop while chasing a suspect and was followed by surgery on the meniscus in his right knee in 2005 and then again in 2006. (*Id*.) Since that time Plaintiff has experienced a persistent decrease in the function of his right knee. (*Id.*) Plaintiff re-injured his knee on December 23, 2010 while again chasing a suspect. (*Id*.)

Upon physical examination Plaintiff's range of motion was from negative 15 degrees to 100 degrees. Dr. Williams observed that Plaintiff stood at neutral alignment and had a "1+ effusion." Hyperflexion pain was positive as was his squat test. Plaintiff's patella was centered, and there was grind and crepitus but apprehension was negative. His facets and his medial and lateral joint lines were tender. Plaintiff had a "1A Lachman," no pivotal shift and no varus to valgus instability. His posterior drawer was negative; he did not have rotary instability. He had atrophy in his quadriceps, but had an otherwise normal sensory motor exam. X-rays of Plaintiff's right knee showed mildly narrow joint spaces. Dr. Williams diagnosed Plaintiff with possible early osteoarthritis, post meniscectomy. Dr. Williams thought that some loose body or another gross abnormality had become dislodged. (Tr. 252-53.)

An MRI of the right knee was taken on February 3, 2011 and revealed the effects of the prior lateral meniscectomy with focal deficiency at the junction of the posterior horn, and a

body segment suggestive of a radial split. There was severe lateral femorotibial compartment arthrosis, and to a lesser degree patellofemoral arthrosis. There was a "reactive usual" with a thickened medial parapatellar and suprapatellar plica, without an over synovitis. Dr. Williams discussed the results of the MRI with Plaintiff on February 15, 2011. Plaintiff had lateral joint line pain, pain with hyperflexion maneuvers, and his range of motion was from 0 to 125 degrees. The tests showed "basically right knee osteoarthritis, primarily affecting the lateral femoral condyle." (Tr 248-51.)

      2.    <u>Dennis F. Fabian, D.O.</u>

Plaintiff first saw Dr. Dennis Fabian on May 11, 2011, seeking treatment for his right knee. He reported he was five weeks post Supartz injections but did not have any improvement in his symptomatology. Plaintiff had no instability symptoms but continued to have pain over the lateral compartment of his right knee as well as in the patellofemoral joint; he told Dr. Fabian that he occasionally experiences episodes of his knee buckling and giving way. On examination, Plaintiff's right knee showed a lack of 7 degrees to full extension as compared to his left knee. He had valgus deformity of about 7 to 10 degrees, but no medial or lateral instability, and no peripheral edema. Plaintiff had slight swelling of the soft tissues around the knee, and a minimal right knee effusion. He could flex his right knee to about 115 degrees, and had the ability to fully extend his left knee. Plaintiff had some right Achilles tenderness, which the doctor suspected was a secondary result of Plaintiff's abnormal gait on his right side. X-Rays of Plaintiff's knees showed end-stage degenerative arthritis of the right knee with valgus deformity. Dr. Fabian recommended a total knee replacement arthroplasty due to the extent of Plaintiff's disease. Dr. Fabian stated that if the procedure was completed Plaintiff would probably

not be able to return to police work. Dr. Fabian diagnosed Plaintiff with severe osteoarthritis of the right knee with flexion and valgus deformity. (Tr. 227-28.)

In a letter to the NYPD Medical Division dated May 11, 2011, Dr. Fabian requested authorization for Plaintiff's knee replacement surgery and summarized Plaintiff's treatment history. He stated that the x-rays of Plaintiff's knee taken on 05/11/11 demonstrated increasing degenerative arthritis with a flexion and a valgus deformity in Plaintiff's right knee and the only alternative was knee replacement surgery; however, if Plaintiff were to undergo the knee replacement procedure he would probably not be able to return to police work. Dr. Fabian also recommended that Plaintiff maintain an exercise program until a decision had been made regarding the procedure. He described Plaintiff as having a "complete disability of the right knee based on his weakness and deformity at [that] time." (Tr. 228-29.)

Plaintiff followed up with Dr. Fabian on September 28, 2011. Dr. Fabian noted that Plaintiff had been placed on disability at the NYPD, and that his condition had not improved "dramatically" since his last appointment. On physical examination, he noted that Plaintiff's right knee had an "obvious" valgus position as compared to the left knee, with about 7 to 10 degrees of valgus. Plaintiff complained of pain over the lateral compartment of the right knee and he had a flexion deformity of about 5 degrees. There was weakness in his quadriceps and vastus medialis oblique area and tenderness over the lateral joint line and under both patellar facets. Plaintiff walked with a moderate limp on the right side. X-rays of Plaintiff's right knee showed significant degenerative arthritis of the lateral compartment of his right knee. Dr. Fabian noted that previous x-rays of Plaintiff's knee showed patellofemoral disease. Again, Dr. Fabian recommended knee replacement arthroplasty. (Tr. 226.)

3.    Dr. William Howe

On April 23, 2012, Plaintiff saw Dr. William Howe, an internist, complaining of worsening right knee pain on the right lateral aspect. Dr. Howe diagnosed degenerative arthritis, and tendinitis of the lateral aspect. He prescribed Mobic, ibuprofen, and a course of physical therapy. X-rays of Plaintiff's right knee taken on April 24, 2012 revealed spiking of the tibial spines, moderate degenerative changes in the medial and lateral compartment, minimally decreased joint space in the medial and lateral compartment, and moderately severe degenerative changes of the patellofemoral joint. There was no effusion. (Tr. 260, 269.)

At a visit on November 26, 2012, Dr. Howe noted that Plaintiff reported needing stronger medication, as non-steroidal anti-inflammatory drugs (NSAID) were not effective. He prescribed Plaintiff Tramadol. (Tr. 261.)

In a medical assessment form completed by Dr. William Howe on June 13, 2013, he opined that the plaintiff could lift and/or carry 5 pounds "maximum occasionally" for 30 minutes and "maximum frequently" for 1/3 of the day; stand and/or walk for a "total" of ½ hour in an 8 hour workday and "without interruption" for ½ hour; sit for a "total" of ½ hour in an 8 hour workday and "without interruption" for only ½ hour; and his reaching and pushing/pulling were affected by his impairment. Finally, he indicated that Plaintiff has the following environmental restrictions: heights, moving machinery, temperature extremes, humidity, and vibration. (Tr. 345-47.)

4.    Chen-Un Kang, MD

Plaintiff saw Dr. Cheng-An Kang on April 30, 2012 complaining of pain in his right hip and right knee. He stated that walking and standing made his pain worse, and resting

and medication made his pain better; his pain, which had worsened over time, was 7/10 at best, and 10/10 at its worst. Plaintiff's right knee range of motion was limited, from negative 15 degrees to 75 degrees. Muscle strength was full at 5/5. Dr. Kang's diagnosis was degenerative joint disease of the right knee. (Tr. 254-58.)

Dr. Kang's notes for Plaintiff's May 29, 2012 visit state that he walked with a limp, and range of motion was decreased in the right knee. Plaintiff's muscle strength was full. (Tr. 255.) Plaintiff reported difficulty in walking during a visit to Dr. Kang on June 4, 2012; his physical examination results remained unchanged. (Tr. 255.) At follow-up examinations on June 29, 2012 and July 20, 2012, Dr. Kang found Plaintiff's condition unchanged. (Tr. 256). X-rays of Plaintiff's right hip taken on June 6, 2012 were normal. (Tr. 268.)

5.      David A. Drucker, MD

Dr. David Drucker, an orthopedic surgeon, examined Plaintiff on January 13, 2013. He observed that plaintiff had full and painless range of motion of the left hip; 10 degrees of flexion contraction and very limited rotation and flexion to about 80 degrees for the right hip. Plaintiff had fairly maintained abduction and a little tenderness in the groin. Both knees revealed painless active and passive range of motion with full extension and flexion to 120 degrees (Tr. 273). He had good ligamentous stability, no joint line tenderness, and distal crepitus and range of motion of the right knee. Dr. Drucker concluded that Plaintiff 's symptoms could be coming from his right hip that might be severely arthritic and Dr. Drucker did not feel that he should undergo a total knee replacement. (Tr. 271-73).

Plaintiff saw Dr. Drucker again on April 4, 2013, after falling and injuring his right knee. Upon examination, he did not have a hip flexion contracture, but did have a knee

flexion contracture of at least 20 degrees. He had loss of internal rotation of the right hip (Tr. 271). Dr. Drucker noted that x- rays of the hip showed no significant arthritis and he was unsure why Plaintiff was having restricted range of motion. (Tr. 271.)

On April 25, 2013, Plaintiff again saw Dr. Drucker who noted that the right knee's flexion contracture was between 5 and 10 degrees and had between 5 and 10 degrees of valgus. Dr. Drucker advised him to take Motrin and to apply lotion to his skin because he has been scratching the skin on his lower extremities (Tr. 270.)

6.    Vadim Azbal, MD

On April 18, 2013, Plaintiff saw Dr. Vadim Azbal, a psychiatrist, complaining of insomnia, social isolation, depressed mood, lack of motivation, and sleep disturbances. Dr. Azbal noted that Plaintiff exhibited a depressive mood, tearfulness, hopelessness, and denied suicidal ideation. (Tr. 281.) He diagnosed him with major depressive disorder, single episode, severe and assigned him a GAF (Global Assessment of Functioning) score of 50.[1] (Tr. 281.) At his May 16, 2013 appointment, Plaintiff complained of minimal improvement in mood.  Dr. Abzal noted Plaintiff's thoughts were logical and his affect appropriate but attention and concentration were "reduced." (Tr. 276).

7.    Richmond University Medical Center

Plaintiff went to the emergency department of Richmond University Medical

---

[1] GAF was a rating of overall psychological functioning on a scale of 1 to 100. A GAF score of 41 to 50 reflects "serious symptoms" or "any serious impairment in social, occupational, or school functioning." American Psychiatric Assoc., Diagnositic and Statistical Manual of Mental Disorders - Test Revision 34 (4th Ed. rev. 2000). The use of GAF was discontinued by the American Psychiatric Association in 2013 because of its conceptual lack of clarity and questionable psychometrics in routine practice.

Center on March 14, 2013, after falling down three to four stairs when his right knee gave out. He was examined by Dr. Sanjiv Batra, who found mild tenderness to the anterior aspect of his right knee, but no swelling. Plaintiff was given two tablets of Percocet for pain. Dr. Batra's impression was osteoarthritis of the right knee. X-rays of Plaintiff's right knee showed moderate degenerative osteoarthritis. Dr. Batra found Plaintiff's knee to be stable and he was discharged. (Tr. 282-93.).

8.     <u>Barnabas Community Medical Center</u>

On May 24, 2013, Plaintiff was seen in the emergency department of Barnabas Community Medical Center for right knee pain after falling from a chair. His right knee was tender and swollen on examination. X-rays of his right knee showed degenerative changes, but no fracture. Dr. Thomas Fowlie diagnosed degenerative joint disease and knee sprain. Plaintiff's right knee was put in an immobilizer, and Plaintiff ambulated steadily with crutches; he was discharged to home in no distress. Tr. 310-44.

9.     <u>Healthcare Associates</u>[2]

Between April 16, 2013 and March 27, 2014, Plaintiff saw Glenn D. Barbus, DO and Lindsay Martino, PA-C for pain management. In his initial questionnaire, Plaintiff stated he had severe, constant pain, as well as weakness in his right leg. He reported that he used a cane but walked in constant pain, could sit for 30 minutes, stand for 30 minutes, and he often lay down. He indicated he was not able to go to work, perform household chores, do yard work or shopping, socialize with friends, participate in recreational activities, or exercise. He had

---

[2] The Court notes that only some of the records regarding Healthcare Associates were before the ALJ. (*See* Tr 74.) Other were submitted at the Appeals Council level. (*See* Tr. 17-55.)

difficulty walking and sleeping, muscle weakness, joint stiffness, pain in his extremities, and decreased range of motion in his right knee and right hip. (Tr. 353-59.)

Dr. Barbus' initial neurological examination of Plaintiff revealed he walks with a limp using a cane, has no gross sensory or motor deficits, has adequate strength in the upper and lower extremities, and has right knee crepitus and pain with motion. Dr. Barbus diagnosed right knee meniscal tear, right knee degenerative joint changes, and chronic pain in the right knee. He discussed medications with plaintiff and "encourage[d] [him] to use recumbent bike, ambulate, and aquatic rehab[ilitation] at this time to keep his legs strong." (Tr. 353-54.)

Plaintiff saw PA Martino on June 28, 2013 and reported 50% improvement in his pain with his current regimen, but reported many days with only 30% improvement. He did not wish to increase his medications. The examination of Plaintiff revealed no gross sensory or motor deficit and adequate strength in the extremities. (Tr. 348-50.)

At a follow-up with PA Martino on August 1, 2013, Plaintiff reported that his medication was less effective the past month; whereas he had been experiencing 75% pain relief, for the past month relief was below 50%. Moreover, he stated "an inability to perform some household chores and [that] he cannot leave his house for extended periods of time where he will be ambulating." The finding of his physical examination were unchanged; his Opana prescription was increased. (Tr. 34-36.)

On August 29, 2013, Plaintiff reported to PA Martino that he was doing well and experienced over 50% pain relief. He was wearing a knee brace that contributed to his improvement. (Tr. 33.)

At a follow-up visit on September 26, 2013, PA Martino noted Plaintiff reported

continued relief of his right knee pain with his current medication and that his knee surgery had been delayed while he explored his options. Plaintiff also reported intermittent left side lumbar pain with radiation into his groin, usually after lying down for an extended period. A lumbar MRI was recommended. (Tr. 31.) The MRI was taken on October 2, 2013 and revealed the following: a mild, diffuse disc bulge at L2-L3; a mild, broad-based right foraminal disc protrusion at L3-L4; a mild, diffuse disc bulge at L4-L5 with mild bilateral foraminal compromise; and a mild disc bulge at L5-S1 with mild right foraminal compromise. (Tr. 16.)

On October 24, 2013, Plaintiff reported continued relief with Opana ER and Roxicodone and no side effects.  His physical examination showed no changes in his condition and in the History portion of her notes, PA Martino indicated that Plaintiff's pain "decreased with lying down, standing, sitting, walking, exercise, and relaxation." PA Martino recommended he see an orthopedist for his knee and epidural injections for his spine.  (Tr. 28-29.)

Plaintiff next saw PA Martino on November 21, 2013 complaining of pain in his lumbar spine and difficulty sleeping. PA Martino again reviewed the MRI of his spine and recommended selective nerve root injection but Plaintiff indicated he wanted to try physical therapy.  The results of his physical examination remained unchanged.  (Tr. 26-27.)

On December 20, 2013, Plaintiff saw PA Martino and reported continued relief of his isolated right knee pain. She noted that Plaintiff's lumbar back discomfort had mostly resolved and was likely caused by severe constipation. (Tr. 24.).

Plaintiff saw  a different PA on February 27, 2014, at which time he recounted that his pain had been "largely controlled over the past month" and  he was experiencing 50 % pain relief with his current medication regime, although it resulted in constipation which at times

was severe. (Tr. 20.) The following month Plaintiff saw PA Martino. She noted he was receiving 50% relief on his current medication regime and wished to hold off on any procedures. Regarding his activities, she noted that "[h]e walks in constant pain, can sit for 30 minutes, stand for 30 minutes, often lies down" and "[i]t is difficult to go to work, socializ[e] with friends, perform[] household chores, shop[], participat[e] in recreational activities and exercis[e]. (Tr. 18.)

          10.    <u>Treating Source Medical Tests</u>

An MRI of the right knee performed on February 3, 2011 revealed effects of prior partial or subtotal lateral menisectomy, with focal deficiency at the junction of the posterior horn and body segment suspicious of a radial split; severe lateral femorotibial compartment arthrosis, and to a lesser degree patellofemoral arthrosis; a reactive usual with a thickened medial parapatellar and suprapatellar plica, without an overt synovitis (Tr. 250.)

An MRI was taken of Plaintiff's knee in April 2013. The MRI showed that Plaintiff had re-torn the lateral meniscus in his right knee. It also revealed progressive osteoarthritis and chondromalacia. (Tr. 267.) An MRI was taken of Plaintiff's hip on April 15, 2013, which revealed a tear of the anterior labrum and suspected chondromalacia favoring the anterior /superior quadrant of the hip articulation. (Tr. 266.)

**C.    Medical Evidence - Non-Treating Sources**

          1.    <u>Lamberto Flores, MD</u>

Plaintiff was examined on a consultative basis by Dr. Flores, a general practitioner, on February 20, 2012. Plaintiff reported several injuries to his knee. In 2004, a fall at work resulted in a right meniscal tear. A surgical correction was performed by Dr. Feldman at St.

Vincent's Medical Center. In 2007, Plaintiff was involved in a motor vehicle accident as a driver resulting in a torn meniscus of the same knee. Dr. Feldman again performed the repair. Plaintiff fell while walking in 2009 and was diagnosed with bone on bone or degenerative disease. He was referred to Dr. Fabian who told him he needed a knee replacement. Plaintiff also reported a history of depression for one year with no medication and no psychiatric follow-up. He claimed he could not tolerate either walking more than two blocks or standing more than 5-10 minutes without severe knee pain but reported no symptoms on prolonged sitting. Further, he had to climb stairs slowly, one at a time, and had severe knee pain after climbing one flight; he stated he was unable to lift more than 20-30 pounds. The only medication he disclosed was Advil, taken as needed. He was driven to the examination by his wife, with whom he lives in a two bedroom, two floor house with one flight of stairs. His activities are resting, watching television, reading and going to doctor appointments. He vacuums, but his wife does the cooking, laundry and other household chores. (Tr. 237-38.)

On examination, plaintiff was "[w]ell-developed, well nourished, oriented, coherent, alert, dresse[d] normally, [and] in no acute distress. He exhibited swelling on the medial and lateral aspects of the right knee. His range of motion was limited from 0 to 90 degrees on flexion. The circumference of the right knee was 43 cm and the left knee was within normal limits with a circumference of 40 cm. He had limping gait but did not need a cane for ambulation and had no difficulty getting on and off the examination table. Straight leg raises were within normal limits. Plaintiff could squat one-third of the way, bend, and do tandem and toe walking, but had difficulty heel walking. (Tr. 238-40.)

Dr. Flores diagnosed Plaintiff with a history of right knee torn meniscus with

surgical correction, history of right knee degenerative disease, and history of depression. He opined that Plaintiff's employment capacity was limited in fully squatting and right knee flexion; he was also limited in prolonged walking, standing, climbing stairs, and heavy lifting. (Tr. 240.)

## DISCUSSION

### I.       Standard of Review

#### A.       Review of the ALJ's Decision

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  The Court may set aside a determination of the ALJ only if it is "based upon legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted).  "Substantial evidence is 'more than a mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion.'" *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case de novo.  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted).  Thus the only issue before the Court is whether the ALJ's finding that Plaintiff was not eligible for disability benefits was "based on legal error or is not supported by substantial evidence." *Rosa*, 168 F.3d at 77.

B. **Eligibility for Disability Benefits**

1. *The Five-Step Analysis of Disability Claims*

To be eligible for disability benefits under the Social Security Act (the "SSA"), a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims. See 20 C.F.R. § 404.1520. This Circuit has described the procedure as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

2.     *The "Special Technique" for Evaluation of Mental Impairments*

The SSA "has promulgated additional regulations governing the evaluation . . . of the severity of mental impairments," that should be applied "at the second and third steps of the five-step framework . . . ." *Kohler v. Astrue*, 546 F.3d 260, 266 (2d Cir. 2008). This "special technique" requires "the reviewing authority to determine first whether the claimant has a medically determinable mental impairment, [and if] there is such impairment, the reviewing authority must rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph C of the regulations, which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Id*. (internal citations omitted); *see also* 20 C.F.R. § 404.1520a(b), (c). "[I]f the degree of limitation in each of the first three areas is rated 'mild or better, and no episodes of decompensation are identified . . . the reviewing authority . . . will conclude that the claimant's mental impairment is not severe' and will deny benefits." *Kohler*, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(1)). However, if claimant's mental impairment or combination of impairments is severe, "in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder," the reviewing authority must "first compare the relevant medical findings [along with] the functional limitation rating to the criteria of listed mental disorders." *Id*. (citing § 404.1520a(d)(2)). If the mental impairment is equally severe to a listed

mental disorder, the "claimant will be found to be disabled." *Id*. "If not, the reviewing authority [must then] assess" plaintiff's RFC. *Id*. (citing 20 C.F.R. § 404.1520a(d)(3)).

### C.    The Treating Physician Rule

Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa*, 168 F.3d at 78-79.  The "treating physician rule" does not apply, however, when the treating physician's opinion is inconsistent with the other substantial evidence in the record, "such as the opinions of other medical experts." *Hallora*n, 362 F.3d at 32; *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).  When the treating physician's opinion is not given controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)).  These factors include: (1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion.  *Id*. § 404.1527(d)(2)(I-ii) & (d)(3-6); *see also Halloran*, 362 F.3d at 32.  Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with good reasons for doing so.  20 C.F.R. § 404.1527(d)(2).

In addition, it is clearly stated law in the Second Circuit that "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it

is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence."  *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (emphasis added); *see also Rivera v. Sullivan*, 923 F.2d 964 (2d Cir. 1991) (reviewing Second Circuit law on retrospective diagnosis and reversing denial of benefits where retrospective diagnosis of treating physician not given sufficient weight with regard to degenerative condition).

          Finally, the ALJ may not reject the treating physician's conclusions based solely on inconsistency or lack of clear findings without first attempting to fill the gaps in the administrative record.  *Rosa*, 168 F.3d at 79.  "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,'" even if the claimant is represented by counsel.  *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Butts v. Barhart,* 388 F.3d 377, 386 (2d Cir. 2004) ("'It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits.'") (quoting *Seavey v. Barnhart*, 276 F.3d 1, 8 (1st Cir. 2001)), amended on other grounds on rehearing, 416 F.3d 101 (2d Cir. 2005).  Specifically, this duty requires the Commissioner to "seek additional evidence or clarification" from the claimant's treating sources when their reports "contain[ ] a conflict or ambiguity that must be resolved" or their reports are "inadequate for [the Commissioner] to determine whether [claimant] is disabled."  20 C.F.R. §§ 404.1512(e), (e)(1).  The Commissioner "may do this by requesting copies of [the claimant's] medical source's records, a new report, or a more detailed report from [the claimant's] medical source."  Id. § 404.1512(e)(1).  The only exception to this requirement is where the Commissioner "know[s] from past experience that the source either cannot or will not

provide the necessary findings." Id. § 404.1512(e)(2). If the information obtained from the claimant's medical sources is not sufficient to make a disability determination, or the Commissioner is unable to seek clarification from treating sources, the Commissioner will ask the claimant to attend one or more consultative evaluations. *Id*. § 404.1512(f).

## II.     The ALJ's Decision

Applying the five-step analysis enumerated in 20 C.F.R. § 404.1520, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of January 11, 2012. (Tr. 62.) Proceeding to step two, the ALJ determined that Plaintiff has the following severe impairments: right knee meniscus tear and degenerative joint disease, depression, and obesity. *Id*.

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 62-64.) In determining whether Plaintiff's mental impairment met or equaled the criteria of listing 12.04, the ALJ first reviewed the evidence regarding Plaintiff's activities of daily living and concluded he had moderate restriction given his ability to drive, load a dishwasher, vacuum, shop, bathe, use public transportation, and shop. (Tr. 63.) Turning to social functioning, the ALJ concluded he had moderate difficulties, noting that while Plaintiff reported not going out and isolating, he also reported that he went shopping, used public transportation, lives with and has "fully interactive relationships with his wife and son," drove, kept doctor's appointments and had no problems getting along with people in authority. (*Id*.) With regard to concentration, persistence and pace, the ALJ determined that Plaintiff's difficulties were moderate given he "reported no trouble paying attention, remembering things,

and could follow both written and oral instructions" as well as pay bills, count change and handle a bank account. (*Id.*) Further, there was no evidence of episodes of decompensation and the requirements of "Paragraph C" were not satisfied. (Tr. 64.)

The ALJ then determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R.404.1567(a) except that he can stand and/or walk for a total of two hours, and sit for a total of 6 hours in an 8-hour workday; can do no operating of foot controls or pedals with the lower extremities, and no operating of motor vehicles; can occasionally climb stairs and ramps, and never climb ladders, ropes or scaffolds; can occasionally balance, stoop, and kneel, and never crouch or crawl; is limited to performing simple, routine, and repetitive tasks, to some moderately complex tasks that can be explained, specifically SVP 1,2, and 3; and limited to work involving only simple decision -making and only occasional changes in routine. (Tr. 64-68.) In reaching this determination, the ALJ found that Plaintiff's medically determinable impairments could be expected to cause his alleged symptoms but his statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible. (*Id*. at 66.) The ALJ reviewed all the medical evidence submitted, including the medical assessment of Dr. Howe to which he afforded some weight and concluded:

> [T]he [RFC] assessment is supported by the evidence of record as a whole, which demonstrates three incidents of right knee torn meniscus, with two surgical corrections, and recommended future knee replacement. The evidence also reflects depression due to [Plaintiff's] physical impairment, retirement from his long standing career, and loss of his child. Despite his physical and mental symptoms, the record reflects that the claimant retained the capacity for daily independent hygiene, some household chores, including loading the dishwasher and vacuuming, going shopping with his wife, and independently utilizing public transportation. While the evidence reflects some difficulties with sleep, isolation,

and with concentration, the claimant testified to improvement with
recent psychiatric treatment and medication.

(Tr. at 68.)

At step four, the ALJ determined that Plaintiff is unable to perform any past relevant

work. (Tr. 68.) Proceeding to step five, the ALJ determined that considering Plaintiff's age,

education, work experience, and residual functional capacity, there are jobs that exist in

significant numbers in the national economy that he could perform. (Tr. 68-70.)

## III.     Summary of Arguments

Plaintiff asserts that the matter should be remanded for a determination of benefits

for three separate reasons: (1) the ALJ failed to afford adequate weight to the Plaintiff's

examining physician medical assessment; (2) the ALJ should have had a medical expert present

to testify; and (3) the ALJ failed to discuss whether plaintiff's hip condition constituted a severe

impairment.

Defendant argues that the ALJ's decision that Plaintiff is not disabled is supported

by substantial evidence.. With respect to the weight afforded Dr. Howe's opinion, Defendant

maintains the ALJ's opinion affording it some weight was proper in light of the evidence as a

whole. Further, he was not required to call a medical expert. Finally,  the determination of

whether Plaintiff's hip condition was a severe impairment became irrelevant because the ALJ

proceeded past step two and considered all of Plaintiff's impairments in determining his RFC.

## IV.     Application of the Governing Law to the Present Facts

After a careful review of the record in this case, the Court concludes that the

ALJ's  conclusions are supported by substantial evidence and he applied the correct legal

standards.

## A.    The Weight Afforded Dr. Howe's Medical Assessment

In determining Plaintiff's RFC, the ALJ thoroughly reviewed the medical

evidence before him, including the examination and resultant findings and any prescribed

treatment of Drs. Fabian**,** Flores, Kang, Drucker, Babus and Howe.  After reviewing the medical

evidence submitted by the treating physicians and the consultative examiner, the ALJ turned to

Dr. Howe's opinion and wrote:

> The undersigned affords this opinion some weight. Regarding the
> claimant's capacity for sitting, standing and walking, this opinion
> in more restrictive than indicated by the evidence of record, and is
> inconsistent with his reported retained capacity for utilizing public
> transportation, shopping and exercising. The balance of Dr.
> Howe's opinion is supported by the evidence of record, including
> objective MRI evidence, which demonstrates torn meniscus with
> two surgical corrections, and right knee arthritis, with
> recommended future knee replacement surgery. It also adequately
> considers the claimant's subjective complaints of pain weakness,
> stiffness, and reduced range of motion.

(Tr. 67.)

An ALJ must accord "controlling weight" to a treating physician's medical

opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2). Inversely, the opinions of a treating physician "need not be given controlling

weight where they are contradicted by other substantial evidence in the record." *Veino v.*

*Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted).

In affording less than controlling weight to the opinion of a treating physician, an

ALJ must "consider various 'factors' to determine how much weight to give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)).  Among the factors to be considered are: (1) the frequently, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist. *See Selian v. Astrue*, 708 F.3d 409 (2d Cir. 2013).  Where the ALJ comprehensively explains the reasons for discounting the treating sources opinion, he complied with the dictates of the treating physician rule. *See Cichocki v. Astrue*, 534 F. Appx. 71, 75 (2d Cir. 2013).

       A careful review of the record reveals that the ALJ correctly applied the treating physician rule.  The ALJ explained that he decided to afford the opinion of Dr. Howe only "some weight" because it was more restrictive than indicated by the evidence of record. (Tr. 67.) Dr. Howe's opinion conflicted with the opinions of Drs. Drucker, Drs. Flores and Babus and PA Martino. Dr. Flores' finding, that Plaintiff "experienced no symptoms on prolonged sitting," directly contradict Dr. Howe's assertion that Plaintiff could only sit for thirty minutes in an eight-hour day. (Tr. 238, 346.)  PA Martino's notation that Plaintiff's pain decreased with lying down, standing, sitting, walking, exercise, and relaxation, also directly refute Dr. Howe's assertion that Plaintiff could only sit or stand for a half-hour in an eight our work day. (Tr. 346.) Further, PA Martino and Drs. Fabian and Babus all recommended activities that were inconsistent with Dr. Howe's more restricted findings.  (Tr. 228, 309, 353-54.)  Dr. Fabian recommended an exercise regimen; Dr. Babus and PA Martino recommended that Plaintiff use a recumbent bike, walk and do aquatic rehabilitation.  (*Id*.)  Dr. Flores observed that Plaintiff could lift up to twenty to thirty pounds, in stark contrast to Dr. Howe's report that Plaintiff could never

bend, or lift more than five pounds.  *See* (Tr. 258, 84-87.) Other evidence in the record from treating sources which supports the ALJ's determination not to afford controlling weight to the opinion of Dr. Howe (an internist who according to the record examined Plaintiff twice), as to Plaintiff's capacity for sitting, standing and walking includes (1) Dr. Chang's April 2012 treatment notes wherein Plaintiff did not mention difficulty sitting or lifting and his examination of Plaintiff which found his muscle strength remained full (Tr. 254, 258); (2) Dr. Kang's July 2012 finding that Plaintiff was only "slightly limited" in range of motion;  and (3) Dr. Drucker's January 2013 assessment of painless active and passive range of motion and full extension of Plaintiff's right knee and his April 2013 advice that Plaintiff take Motrin for pain relief. Dr. Howe's opinion was also inconsistent with Plaintiff's admission that he was able to lift up to 20 or 30 pounds (Tr. 238), drive (Tr. 200), utilize public transportation, shop and walk 10 to 20 minutes (Tr. 197-205.)

       Given that Dr. Howe's opinion as the Plaintiff's capacity to sit, stand and walk was inconsistent with other substantial evidence in the record as a whole, it was proper for the ALJ to give it less than controlling weight. *See*, *e.g.*, *Van Dien v. Barnhart*, 2006 WL 785281, at *13 (S.D.N.Y. Mar. 24, 2006) ("The ALJ appropriately gave less than controlling weight to [the treating physician's] opinion and relied more heavily on the evidence provided in the consultative opinions."); *see generally Halloran*, 362 F.3d at 32 (finding that treating physician's opinions should not be afforded controlling weight where they were "not particularly informative and were not consistent with those of several other medical experts").

       For the foregoing reasons, the Court finds the ALJ did not violate the treating physician rule.

**B.      The Need for a Medical Expert to Testify**

Relying upon instructions contained in the Hearing and Appeals Litigation Law Manual ("HALLEX") at I-1-5-34(A), Plaintiff argues that the ALJ should have obtained an opinion from a medical expert because he afforded great weight to the opinion of Dr. Flores. a general practioner, but "Dr. Flores' opinion was silent as to Plaintiff's limitations regarding sitting" and therefore the ALJ wrongly assumed there was no restriction. (Pl.'s Mem. at 18.) Additional error is ascribed to the ALJ's failure to follow Dr. Flores' recommendation that Plaintiff be referred for orthopedic and psychiatric evaluations.

The ALJ had no obligation to seek an expert medical opinion. "Even if HALLEX bound the ALJ to a certain course of action - which it does not - it provides that an ALJ has discretion to ask for the opinion of a medical expert, save for special circumstance" that are not implicated here. *Velez v. Colvin*, 2015 WL 8491485, *10 (S.D.N.Y. Dec. 9, 2015) (citing *Harper v. Comm'r of Soc. Sec.*, 2010 WL 5477758, at *4 (E.D.N.Y. Dec. 30, 2010) (footnotes omitted)). Moreover, Dr. Flores stated in his report that Plaintiff reported "no symptoms on prolonged sitting." Given the absence of any findings by Dr. Flores as to an inability to sit, it was proper for the ALJ to rely on that absence in assessing Plaintiff's RFC. *See Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995) (upholding ALJ's determination that claimant had ability to sit for prolonged period "given the absence of finding by any physician concerning plaintiff's alleged inability to sit for prolonged periods of time"); *Samuel v. Comm'r of Social Security*, 2014 U.S. Distr. LEXIS 163220, at *4-5 (E.D.N.Y. June 3, 2014) (In view of fact that consultative examiner concluded that claimant was restricted in heavy lifting, ALJ was permitted to infer that plaintiff had no other restrictions).

Nor does the Court deem any error in the ALJ not referring Plaintiff for orthopedic and psychiatric evaluations given the presence of psychiatric and orthopedic records from treating sources and that the failure to follow procedures outlined in HALLEX does not constitute legal error as they are merely a set of internal guidelines for the SSA, not regulations promulgated by the Commissioner. *See Harper*, 2010 WL 5477758, at *4.

### C.  Plaintiff's Right Hip Condition

Plaintiff's final argument is that the ALJ failed to discuss whether his hip condition constituted a "severe impairment," within the meaning of 20 C.F.R. § 416.920(c). (Pl.'s Mem. at 18-19.)

The ALJ did not evaluate Plaintiff's hip injury under steps one or two of the five step analysis required under C.F.R. § 404.1520.  Specifically, he never determined whether Plaintiff's hip was a "severe impairment" within the meaning of 20 C.F.R. § 404.1520(c), step two.  He did, however, explicitly take Plaintiff's hip injury into consideration when formulating Plaintiff's RFC. (Tr. 65-67.)  The omission of an impairment at step two may be deemed harmless error where the disability analysis continues and the ALJ later considers the impairment in his RFC determination. *Woodmancy v. Colvin*, 2013 Westlaw 5567553, at *4-5 (N.D.N.Y. Oct. 9, 2013), *aff'd*, 755 Fed. Appx 72, 74 (2d Cir. 2014). Here, the disability analysis continued past step two. Because Plaintiff's hip injuries, i.e. a tear of the anterior labrum and chondromalacia favoring the anterior/superior quadrant of the hip articulation are not listed under Appendix 1 of 20 C.F.R. § 404.1520, the ALJ's analysis was required to consider the combined impact of all impairments when determining Plaintiff's RFC at step three. *See* 20 C.F.R. §404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your

medically determinable impairments that are not 'severe,'").  Here, the ALJ considered all of the severe and non-severe impairments in Plaintiff's RFC determination, including explicit consideration of Plaintiff's hip condition. (Tr. 65, 67.)  Accordingly, any error at step two is, at best, harmless.

## CONCLUSION

For the reasons set forth herein, Defendant's motion for judgment on the pleadings is  granted and Plaintiff's cross-motion for judgment on the pleadings is denied.  The Clerk of Court is directed to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
  February 21, 2017

      s/  Denis R. Hurley
     Denis R. Hurley
     United States District Judge